Good morning. May it please the Court, my name is Thomas Heard. I represent the appellate United States Fire Insurance Company. I'm with the law firm of McElroy, Deutsch Melvania Carpenter. I'd like to request that I reserve three minutes for rebuttal. That's granted, Mr. Heard. Thank you. This case involves a contract for the construction of four deck barges that  are basically floating workstations. They're basically platforms that people would put cranes or other things on floating on the water to work. They don't carry cargo, they don't transport anything. And we understand that, we've read it, so we understand that the paint didn't have the right number of milliliters, and they conceded it didn't, and it's hard to do that because it's dark inside. I mean, we really have read it, so why don't you go to the essence of your argument? Sure. One of the points I want to make, though, is that these barges, the parties agree, these barges were soundly, sturdily constructed. They have been used continuously by cashmen for their intended purpose. The customers of cashmen love them. But cashmen wants to recover back, not from the manufacturer, because the manufacturer is now defunct and bankrupt, but from U.S. fire, every dime that they paid for the barges plus another $300,000 and, by the way, wants to continue to use the barges and make money from them in the interim. They contend that the cost of repair is between $2.5 and $4 million, depending upon which estimate you accept, which is two to three and a half times the original price of the barges less than five years ago. Yeah, but everything has gone up. That's not, I mean, we live in an inflationary time, so. U.S. fire is invoking the economic waste doctrine because it's our position that the cost of repair by cashmen is grossly disproportionate to any loss in value of the barges due to the paint defects. But your responsibility is limited to the amount of your bond, isn't it? I mean, even if they're seeking $3 million, there's still a limit. That's correct. It's limited to the penal sum of the bond. $1,100,000 or something like that? $1,200,000, yes. Now, you suggest that cashmen and HBC entered into a second contract that operated as an accord and satisfaction. Yes, Your Honor. Did you assert that defense in the district court? We did, Your Honor. We attached an affidavit to our response to the motion for summary judgment that asserted the existence of that contract and the fact that the price for the contract took into consideration the liquidated damages due under the first contract. Does it say that? Yes. Does the second contract specifically say that part of the consideration for this contract includes the $100,000 liquidated damages of that first contract? I don't know the answer to that because the second contract has never been produced. So all you have is an affidavit that says so. From the CEO of the company. That's correct. Did you ask in discovery for the second contract? Yes, we did. We did. It's a contract between who? Between HBC and Cashman. Correct. A contract, by the way, that U.S. Fire did not bond. Okay. But you asked for it in discovery and it could not be produced? Correct. I think Cashman's response, I believe, is that it didn't exist. That there was negotiations but that there was never actually a bond. I was just going to ask you, was it a written contract or maybe a verbal discussion? No, my understanding, and I believe that the affidavit that we submitted was that it was a written contract. Well, it's important to the tune of $100,000, but I wonder what you presented in the district court. We presented an affidavit from Walter Coons, who was the CEO of HBC, about the existence of that contract. So what are you asking about that issue? Pardon? What are you asking about that issue? What we're asking on that issue is that the judgment for liquidated damages be reversed because we raised, at the very least, there was a material disputed issue of fact which was not addressed or resolved. By the district court, not the magistrate. Correct. I mean, that issue was already taken away by the time we got to the magistrate. Did you argue the case? I mean, did you argue this issue and say to the judge, what about the accord and satisfaction issue? Yes, we argued that on the motion for summary judgment, absolutely. All right. We presented in the testimony before the magistrate judge testimony and written evaluations from a very experienced marine surveyor hired by Cashman who provided valuations of the barges both before and after the paint defects were discovered. Those valuations show that there was no loss in value of the barges. In fact, they went up in value. Nobody's asking for, I mean, steel goes up in price. So what if they went up? I mean, what is the, what happens with that? The so what is that if indeed the paint defects caused a decrease in value of the barges, one would expect that the surveyor, having discovered the defects and described them in his reports, would alter the valuations of the barges. They would be worth less because of these defects. In fact, they weren't. He saw the defects. He described the defects. But he did not change the value of the barges because Help me a little bit because you know this case much better than I do. I understood that the damages were that they couldn't, or that you argued, that they couldn't, they ran out these barges and that's what they, and that's the value to them. Correct. And they continued to rent them out with the defects. Correct. At the same rates. But the problem is the useful life. I thought that their argument was premised on the expectation, had the contract been performed properly, of a 30-year useful life. And, in fact, they were only, I think, estimated to be 20 years useful life. That is correct, Your Honor. Ten years of rental income. Right. And that what the trial court did was essentially reject the testimony of the only person in the case who had an experience valuing the barges. And I think wrongly so. He ruled in conclusion of law number 63, I believe it was, that for some reason that evidence was insufficient to prove that there had been no loss of value to Cashman. And I think that's wrong for a couple of reasons. Excuse me. Help me again because I'm still, I didn't get a chance to. Judge Hardiman said, and you agreed, that the damages, ledge damages are because the useful life has been decreased from 30 to 20 years. And you said that's what the claim is. How does the fact that the steel price has gone up factor into that? Or does it have nothing to do with that? I don't think it has anything to do with it. All right. That's just what I wanted to, I wanted to connect the two issues. Go ahead. The claim by Cashman was for the cost of repair, or at least so much of the cost of repair as they could recover under the bond. To show that the cost of repair was not grossly disproportionate, there was an effort to show that they would be losing a revenue stream from these barges at the tail end of their lives if, in fact, they didn't reach the useful life of 30 years. And that that revenue stream was not disproportionate to the cost of repair. Wasn't this typical proof of damages that's presented by expert witnesses and the court makes a decision regarding questions of credibility and so forth? Isn't that what the magistrate judged? Well, but here's the problem. The problem is that the magistrate didn't have the evidence on the record to do what he did. What evidence? What he did was take the Cashman's expert testimony that the useful life of the barges was shortened from 30 to 20 years. He also took some testimony that the barges were rented at $7,000 per month. So he said, okay, $7,000 per month times four barges times 10 years, we have a lost revenue of $3,360,000. What evidence was missing? He acknowledged, the trial judge acknowledged two problems with that. One is there was very little evidence of how often they were rented. More often than not. That's it, exactly. He credited that testimony as honest, and he gave that the minimum allowable, 51%. 50%, right. 50%. Okay, so so far there's sufficient evidence. I mean, we don't know whether that was credible or not, but he thought it was. But here's the critical point. The 25%. Exactly.  That was a plug number, you're saying. Yeah, about what costs Cashman had to expend to generate that revenue. And so what the magistrate did was assume that the cost would be 25%. In other words, that this business had a 75% profit margin. Well, what business in this environment or any other has a 75% profit margin? There was no evidence to support that. And in terms of practical experience, it's not supportable. Is it true that he significantly cut back in that final number that he came to to award solely the amount that's allowed under the bond? No, he didn't, because what he does is he takes that, he reduces by 50%. I mean, he came up to almost 100% more than what the bond allows, didn't he? What he came up with as the estimate of lost income, and this is from. . . What is the total amount that the magistrate judge came to? Without the interest. For the award? Yes. The total, I think, is $1.5 million. You mean without the interest, $1.2 million? Around $1.3 million. All right. What he came up with as. . . That was the amount of the jury bond. Yeah, that was the amount of the bond. What he came up with as the estimate of lost income from this calculation where he plugs in the 25% cost number was $1,260,000. Another fatal flaw in his analysis is that that loss of income, if it ever occurs, is going to happen 15 to 25 years from now, when the barges are between 20 and 30 years old. And therefore, that loss of income must be discounted to present value, which the court failed to do or consider. Why isn't that a wash, though? I mean, because. . . You want to discount it to present value based on the time value of money, but you're not allowing for the fact that if they're getting $7,000 a month now, there should be a commensurate increase in what they can rent it for during years 21 through year 30. That seems to me to be a wash. Well, actually, that's another point, which is that the evidence in the case, the documentary evidence in the case, showed that the barges were renting for as little as $3,000 a month, not the $7,000 that the trial court calculated. But it's not. . . I respectfully submit it's not a wash. You need to reduce that number to present value. If you do that, you're talking about a number in the $300,000s, not a number in the millions. And the cost of repair, whether you call it $2.5 million or the amount of the bond, is clearly disproportionate. If you do reduce it to present value, then they have a right to put on testimony that estimates what they could rent them for in years 21 through year 30. They would have, yes. Could we get to the issue of the percentage on interest? Sure. Which I know your time is up, but we're interested in that issue. Okay. It's a choice of law issue. It is a choice of law issue. 12% versus 6%. Correct. And what did the court do? What the court did, what Judge Bailson did, at the conclusion in deciding the motion for summary judgment, was say, this is substantive law, Massachusetts law, I'm going to apply Massachusetts law 12%. What the Pennsylvania courts have said, and what this court said in Yohannan, is the issue of prejudgment interest is procedural under Pennsylvania law, and therefore you apply the law of the forum state, which would be Pennsylvania. Tort cases, though. Yohannan is a tort case. Can you persuade us why the – you've articulated correctly in your briefs and here today the Yohannan standard, but can you explain to us why that should be transmuted into a contract case? Sure. Because Judge Newcomer in the optotics case noted that Pennsylvania law makes no distinction between delayed damages in a tort case and prejudgment interest in a contract case. They are treated the same. And so Judge Newcomer in the optotics case, dealing with breach of contract, said it's procedural, you apply the law of the forum state. But that's not precedential. That doesn't show us what Pennsylvania would do. I mean, that's what a district court judge who was on an equal level with Judge Balson said. Correct. But don't we have to look at what Pennsylvania would do? Exactly. But that is what Judge Newcomer said in his opinion was he would – But you've got to tell us why that's persuasive, though. It's not enough to say he said it. Why – I mean, there's an important distinction between the policy requiring the payment of interest in a tort-type case versus a contract case. And the only thing I can say is that the Pennsylvania courts treat them both the same. And although Cashman would like to argue why it should be different, it's my understanding that the task of this court is to understand what Pennsylvania courts do and apply it. Why wouldn't Pennsylvania courts adopt the restatement? Pennsylvania courts have not. There is not a single case that adopts that. The vast majority of jurisdictions adopt the restatement, which, of course, would favor following the underlying contract and the 12% interest authorized in Massachusetts. Correct. But Section 194 has not been adopted by any Pennsylvania court. Does anybody have any more questions? No. Okay. Thank you. Your red line is on. We'll get you for rebuttal. I guess he saved rebuttal. I assume he did. Good morning, Your Honors. It's a pleasure to be here. My name is Matthew Marone. I'm here with my partner, Henry Lucas, from the law firm Lucas & Cavalier, and I'm also here with General Counsel from Cashman Equipment Corporation, Andrew Saunders. If I may, I'd like to take eight minutes. I see the clock is already on. To address the issues relevant to U.S. Fires Appeal. Oh, yeah, you're going to divide this. Exactly. So you're talking about which? Well, I'll talk about essentially why Cashman Equipment Corporation is entitled to the whole principal amount of the bond, and Mr. Lucas will talk about the difference in interest rate percentages. The choice of law. Exactly. Okay. And it's clear that Your Honors have a good sense of the case already. We really read the briefs. I know there are some courts that don't, but we not only read them, we research them. Go back and tell them that. Thank you. There's two overriding points I'd like to make here. One is the fact that these barges are revenue-producing assets for Cashman Equipment Corporation, and the second is that no matter what happens here today, Cashman is not going to be made whole on their damages. And on the first point, back in 2002, Cashman made an investment in these barges to the tune of $1.128 million. To have these four basically revenue-producing assets constructed, and the idea was to coat the insides to give them 25 to 30 years of life. They haven't gotten that. As it is now, these barges are corroding, they are decaying more rapidly than they otherwise would, and their lives have been shortened by 10 years. And the reason we presented evidence of the lost revenue was to show that this is a real loss to Cashman Equipment Corporation. This isn't some – it's not like HBC used a different kind of paint than they were supposed to. The purpose is to show that they are going to be losing money on the tail end of these barges' lives that they wouldn't be losing. We know that. It's a damages case, though. How do you explain this 25% plug number? I searched in vain in the record as to where that came from. I'm not sure. I'm not sure it's relevant either. We are entitled and we were entitled at trial to prove our damages by the cost of repair, which we did. If they want to show that the cost of repair is disproportionate to our loss in value, they have the burden of showing that. With all due respect to Judge Strawbridge, who I believe did a great job with his findings of fact and conclusions of law, 25%, 75% profit margins, those are not relevant to this Court's analysis. If U.S. Fire wanted – Doesn't that go right to the economic waste doctrine? Aren't you getting substantially more than you paid for the barges just a couple of years before? I think that considering the fact that the barges have gone up in value or considering just the cost of repair by themselves, frankly, has no place in this case. U.S. Fire continues to harp on that argument. If they wanted to show that the cost of repairs, it was going to be wasteful for us to repair these barges, the burden was on them. They're arguing it. It's a legal concept. It's not a proof issue. And as I understand their argument, which frankly seems to have some logical appeal, they're saying under the law, when there's a breach of contract, we're not going to require someone to, quote, fix something at three or four times the cost of what it would be to replace it. That just makes no economic sense. It's wasteful and irrational. That's what I understand their argument. And respectfully, I disagree and say that it is a proof issue, and Judge Strawbridge found that. We had the burden of first proving that we had a loss in value, that this isn't some frivolous repair that we want to have made. And we showed, and he found, that we have a very low burden of showing that we have. You're not even required to make the repair. That's part of the difficulty here. If I'm the CEO of Cashman and I get the money to repair, I know we're limited by the bond, but pretend there's no bond here. If it's $3 million I get in cash, why would a rational person repaint, repair the barges when you can go out and buy 12 new ones? That's the question. That makes no sense. Can you? Was there evidence that one can go out and buy barges? There was no evidence, and I think that's a— So there's no evidence either way. You didn't put on any evidence that you couldn't go out and buy them. Correct, but the burden was on them to do that. And respectfully, why would I do that? Because I can protect the 10 years on the end of the lives of these barges and essentially protect what we— So a rational person would spend the $3 million to get 10 more years on the back end of four barges rather than going out and buying 12 brand new ones that you would expect to last 25 or 30? I don't know that we can buy them for $3 million, Your Honor. In fact, I submit that we probably can't at this point. Yeah, but there's no—well, there comes proof. The burden, again, I submit the burden was on United States Fire at trial to show that this is wasteful to do. Let's assume for a minute, just humor me for a minute, assume it would violate the economic waste doctrine. You're really just looking for the million. You're capped out at $1.2 million anyway, so assume for a minute that there is a problem with economic waste. Why do you still get the $1.2 million? Well, I'm not sure I can answer that. If there were a determination that the repair costs were economically wasteful and there were a determination that we were required to pursue diminution in value as a measure of damages at trial, then we wouldn't. I thought you were going to tell me that your answer is that you've still got the 10 years of useful life that you lost. Isn't that independent of the cost of repair? Well, I guess if they had presented at trial, if they had met their burden of proving economic waste doctrine, we would have pursued that as a measure of damages. We did not pursue that as a measure of damages at trial. You put all your eggs in the repair basket. As we're entitled to do. And if they had come forward with evidence, why didn't they hire an appraiser to say, yes, the barges have gone up to $1.6 million. That's all they'd be worth no matter what. If they had done that, frankly, we would have pursued the lost revenue, the lost profit aspect of it. But they didn't. All they're saying is the barges went up in value. Did you prove what the value of the barges were pre-repair and hypothetically if they had been repaired? We didn't because that's not our burden. That was their burden to do that. We proved cost. We proved cost of repair for sure. Well, cost of the barges. Well, yeah, we paid for them. No, you didn't prove cost of repair or what the value of the barges would be had they been repaired. Correct. We proved cost of repair. We didn't prove change in value. The burden was on them to do that, and they didn't. To say that the barges have gone up in value, okay, they did. To say that the cost of repair is 2.5 to 3 times the amount of the contract, well, yes, it is because it's a lot harder to do now. Okay, so to prove that, it just didn't make sense to repair the barges. You say that that's their burden. Correct, it is. Under the restatement and as the trial court found, the burden is on them to show it is economically wasteful, and to do that, they have to show that the cost of repair is not proportionate to the loss in value. And by the way, the difference in market value, that then assumes that cash is going to just sell these barges, which they don't want to do. They still have them. They're still using them. They're still making $7,000 a month on them. They don't want to go out and sell them. Is that right, $7,000? What about the point about discounted value or discounting the rental value to the president? Again, those numbers were presented to show that there is a loss in value to Cash for Equipment Corporation because U.S. Fire's position is that – That was to rebut their defense that they were worth more. Well, it was to show that we have a loss. Their point is that you've got good, structurally sound barges no matter what. Their position is basically that the paint job inside is aesthetic, which it absolutely is not. It slows the process of corrosion. It extends the life of the barges. And to quantify it, to say loss in barge life means loss in revenue to Cashman. This isn't just, you know, we keep them for 15 years and scrap them. Before you sit down, where do these barges go up and down? What rivers? Well, they're primarily off the coast. They're in the Chesapeake Bay, for instance. They don't go up and down the Delaware River? I don't believe they do. I keep looking out my window here in this building. I'm wondering whether that's one of the barges. I was actually going to suggest the South Street Bridge to put it in perspective. The bridge is being reconstructed. It just caused hell. That's right. And if you look, you can see deck barges on the river that have cranes mounted to them that basically help build these bridges, and that's what Cashman does. They're pure moneymakers for Cashman. That's all they are. They're not party boats. They're not recreational vessels. They're floating decks. Okay. All right. Thank you very much. Thank you. Now, Mr. Lucas, was it, who's coming up? Great. Please, the Court. You already know Mr. Lucas. I'm representing Cashman on the cross-appeal. There are two claims put forward by Cashman in this case under the same contract, that is, construction contract. That is the claim for liquidated damages and the claim for unliquidated damages. The claim for liquidated damages arises out of HBC's duty as the builder of the barges. Excuse me. Yes. It arises out of HBC's duty as builder of the barges to deliver the barges on time. If they don't deliver the barges on time, there is a formula for damages in the contract for which they're responsible. Judge Baleson, in his memorandum of order, addressed this and awarded to Cashman liquidated damages of $100,000. And to that award, it added interest to 12% on Massachusetts law because Judge Baleson found Massachusetts law applied by virtue of the clause in the contract, the terms of law clause, which pointed to the Massachusetts law. I'm sorry. Just back up a little bit. Okay. Because Judge Baleson recognized – But the bond itself did not have a choice of law. The bond does not have a choice of law clause in it. So what did he base it on? He based the award on the vessel construction contract. No, no. That had the choice of law. Why didn't he base his decision that Massachusetts law governed the interest rate, the post-judgment interest rate? Because if you apply Massachusetts law to determine the liability of HBC for fair or deliberate debauchery under the liquidated damages formula, they're entitled to prejudgment interest on top of that award. And since the underlying law, which governs whether they're liable for liquidated damages in Massachusetts law, clearly he had a right of applying the Massachusetts prejudgment interest statute. That's why he did it. Well, what if it's procedural? It's not procedural, Your Honor. It is not procedural. There's been great issue made of the – To me, there's a certain appeal to follow the law of one state in one transaction. Right. But I'm just wondering because there's a very good argument being presented that the Pennsylvania interest provision should apply. Well, that argument is premised upon this Court's decision in Ohanen, but Ohanen has been trumped. It has been trumped by the Supreme Court of Pennsylvania's decision in ESL in which the Supreme Court of Pennsylvania specifically held that Rule 238, which awards delayed damages in tort actions, does not apply to contract cases. And therefore, Would you name that case again? Tolumas, T-O-U-L-U-M-E-S. I cited it in my brief. That is in the first step of my brief, Your Honor. The citation is 387, P.A., 287, 899 Atlantic 2nd, 343, and it's 206, P.A., Lexis, 994. And it's been followed. That case was handed down in 2006, which was after the decisions which Mr. Hurd alluded to as following Ohanen, the optics case that was decided in 2005. In other words, Ohanen and the progeny of cases which followed it saying that prejudgment interest is procedural for choice of law purposes, not only in tort cases, but in also contract cases, were all decided before Tolumas. And they would depend upon Judge Hutchinson's prediction in the Ohanen case that the Supreme Court of Pennsylvania would require their courts to apply prejudgment interest uniformly under Rule 338 in all cases, all cases, which has led the courts since Ohanen to assume that all cases met contract cases also. Mr. Lucas, can I ask you something? I don't mean to take you off message, but I do have an interest in the issue that's raised by Mr. Hurd. Yes. Concerning the accord and satisfaction. He said that that $100,000 amount, I don't know if you're prepared to address it or not. That's all right, that's all right. There's never been any proof submitted by them that there was any contract. He asked for a contract, a subsequent contract. There was no, we couldn't produce that which was and was. There was nothing in writing between CEC and HBC regarding the building of additional barges beyond the four barges in the solidification. Is that your response? That's my response. That was your response to Mr. Lucas during discovery. No, he's Mr. Lucas. I'm sorry. Mr. Hurd. Correct. That's our response. They haven't proved it. There's nothing out there. There's nothing out there to show there was ever anything in the form of a tangible written document whereby CEC agreed to have HBC build additional barges beyond the four barges. Therefore, there's no accord and satisfaction. They would be surprised given the history of building the first few barges that had the painting problem, but that doesn't mean it wouldn't happen. Well, HBC went into bankruptcy. That's reflective of some absence of total competence regarding how to apply paint. Not necessarily. In any event, we have the award of liquidated damages where the court has ruled that Massachusetts law governed, but then we have the claim for unliquidated damages. That's the claim for compensatory damages for the failure of HBC to abide the specifications in the contract for paint coatings and also a claim for the failure to have the work in the construction of barges, including paint coating, complied to be in a workmanlike manner to comply with industry standards and also in accordance with ABC rules. HBC failed to do that. That failure was a breach of their warranty and a breach of their duty to deliver the barges and the specifications of the contract. For that, CEC sought unliquidated damages. That was tried below, but however, the court has ruled that the law applicable to govern HBCs and derivatively U.S. Fires liability for those breaches is Pennsylvania law and not Massachusetts law. And it's that inconsistency anomaly to the prejudice of CEC which brings us here to ask this court to reverse the district court's decision. The base contract specified Massachusetts law. Absolutely, Your Honor. Absolutely. And I also thought that the base contract was incorporated by reference into the law. Absolutely, Your Honor, which has a great significance. I see my time is running out. No, no, go ahead. It has a great significance. Is it your argument that that incorporation is effective, which would be game, set, and match Massachusetts law translates? Absolutely. Absolutely. I didn't really understand that to be your argument. I thought in the briefing your argument, there's tremendous discussion about what you talked about with Yohannan and whether Yohannan, there was this back and forth between counsel regarding whether Yohannan controlled. Right. Is that your main argument or is that your fallback, Corey? No, the critical decision on which U.S. fire relies is that the matter of prejudgment interest even in contract cases is procedural. If it's procedural, then my request to you to overturn the decision below on the unliquidated damages is folly because this court will apply Pennsylvania law using the standard conflicts that matters of procedure for choice of law basis will govern and the theorem law will apply. All right. Very interesting. So if I understand your argument, you're saying that if this is a procedural matter, that would vitiate the efficacy of the Massachusetts choice of law in the base contract. No, it wouldn't vitiate the efficacy of it because the, yes, yes, you're correct. You're correct. If it's a conflict, we've got to apply the procedural law. You're correct. Which would be Pennsylvania law. But the point of the matter is, is that the decision of Toulumas deliberately cuts out from the Yohannan case the applicability of Rule 238 delay damages to contract cases and contract cases and prejudgment interest in contract cases is another animal than prejudgment interest in tort cases. Okay. Are you okay? Okay. Thank you, Mr. Lucas. You're quite welcome. We'll hear Mr. Hurd on rebuttal. Thank you. Toulumas only says that Rule 238 damages do not apply in contract cases. It does not say that prejudgment interest in contract cases is not procedural and, in fact, if you go back to the Yohannan case, the reason Toulumas doesn't overrule Yohannan is because the Yohannan court expressly says the state, the purposes of the two statutes or the two types of prejudgment interest, 238 in tort cases and prejudgment interest in contract cases is the same and, therefore, they should be treated the same. So I don't think that Toulumas overrules Yohannan at all in that respect. With respect to Your Honor's point, Judge Hardiman's point about the base contract being incorporated into the bond, in Pennsylvania, under Pennsylvania law, and in particular the Downingtown case which we cited, the surety's obligation is limited to the obligation and the bond. They do not, by issuing a performance bond, even when the bond incorporates the contract, agree to all of the obligations that are set forth in the contract. That's clear. They agree to some of them? They agree to whatever is included in the bond. For example, in this bond, there was a provision for liquidated damages under certain circumstances, which is if cashman terminated and the surety agreed to complete, neither of which took place here. So there were provisions, there were obligations. They agreed to the performance obligation. They agreed to liquidated damages under some circumstances. What they didn't agree to was the liquidated damages for delay in delivering the barges. I'm not sure I understand that. I'm sorry. I understand the concept that your obligations under the bond may not overlap completely with the base contract. Of course, damage is being a prime example, right? Someone's entitled to $10 million under the contract, but you're limited to the exposure of the bonding amount. Correct. But why does that mean that when you're silent in the bonding agreement on choice of law, so there's no conflict between your contract and the base contract, why wouldn't that base contract's provision for Massachusetts law translate into the new contract? There's no conflict or any problem there. Well, Judge Bailson applied the interest context analysis, which I believe is the appropriate analysis under Pennsylvania law, and concluded otherwise. He concluded that Pennsylvania had the greater interest. You can only get into that if you don't have an explicit choice of law. Correct. So why did he answer the question, and this is one of the vexing issues for me in this case, is there didn't seem to be that much discussion about this choice of law being effective through incorporation. Was there below? I mean, am I raising an issue that hasn't really been handled by the parties? I don't recall off the top of my head how much discussion there was at oral argument. There was some discussion of this in the briefs. All right, but why – can you cite a case for me or give me some other reason why the Massachusetts choice of law in the base contract, which was incorporated by reference into the bond contract, ceases to be efficacious? I think Downingtown is such a case, but the reason is that the surety is not a party to that contract. The surety doesn't agree to that choice of law. Well, but people who aren't parties to contracts incorporate other contracts by reference all the time. That makes you subject to the terms of the contract that's incorporated. Well, I mean, that's the point of Downingtown. It does not make the surety subject to all of the obligations in the underlying contract. All right, I'll have to study that. One other point I just wanted to raise, which is the question of why didn't – there was an issue raised about why didn't we present an appraiser, and the reason that we didn't is we presented their appraiser. We thought that was the best evidence we could present, is the appraiser hired by them who did the appraisals before there was a lawsuit and did the appraisals after there was discovery of the defect. We thought the fact that his appraisal showed that there was no loss in value was the most persuasive evidence we could present. That was good evidence, but I guess the district judge or the trier or the magistrate perhaps found that those valuations were done for a different purpose, right? You were trying to feed them back the valuations they created when the bank was interested in knowing or some lender was interested in knowing what they were worth. They were provided to the lenders. What's curious to me is that the trial court said that those appraisals were insufficient, and he seemed to be saying they were insufficient because they didn't take account of revenue, lost revenue. And Cody and the other cases we cite clearly say that you don't have to have an analysis of lost revenue in order to determine a market value. That's simply not required. So if that's the reason that the trial court was saying those appraisals are insufficient, I think that's wrong as a matter of law. All right. Thank you. Thank you, Your Honor. Thank you, gentlemen. We'll take the matter under advisement. Well argued.